**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Brian W. Simpkins, being sworn, state:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Massachusetts State Police Trooper since 2006, and am assigned to the Division of Homeland Security, Narcotics Unit. As a Massachusetts State Trooper, I was initially assigned to patrol out of the Framingham, Sturbridge, and Boston Barracks, and then to the Community Action Team in the city of Boston working in a high crime area focusing on gang and drug activity.

2. Since July 2016, I have been assigned as a Task Force Officer to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.

3. I am a graduate of the Municipal Police Training Committee ("MPTC") Police Academy (9th Municipal Police Officers Class, Weymouth), and the Massachusetts State Police Academy (79th Recruit Training Troop, New Braintree). Prior to becoming a trooper, I was a Canton Police Officer in a full and part-time capacity from 2001 to 2006. I have a Bachelor of Science degree in Criminal Justice from the Northeastern University. I have attended numerous

narcotics investigation courses, including a two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

4.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

5.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which drug traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of telephone calls to avoid speaking over the telephone.

**Purpose of the Affidavit**

6.     I submit this affidavit in support of an application for a search warrant for the following target location, which is described as follows and in Attachment A-1:  41 Norfolk Street, Dorchester, Massachusetts is a two story mixed use (commercial/residential) building located at the corner of Norfolk Street and Whitfield Street. The building is tan in color with white shutters. There is a fenced in grass area on the front side with steps leading up to the main door facing the street. The main door is brown with a window. Two mailboxes are affixed to the siding to the left of the door with the number "41" just above the mailbox. To the left side of the main residential structure is a fenced in driveway leading to an attached garage. This garage has a roof top deck with a door leading form the main residential structure. To the right side of the main residential structure is an attached one story commercial structure, which is tan in color. On top of the commercial structure is a black sign with white lettering that reads "Ally's Inner City Auto Body & Sales." The commercial structure has a garage door facing Whitfield Street. There is a large fenced in parking lot attached to the commercial structure filled with densely parked vehicles. The Target Location to be searched is the commercial office space for Ally's Inner City Auto Body & Sales, the garages that are attached to the commercial space, the adjacent fenced-in lot associated with the commercial space, and the vehicles that are parked inside of the fenced-in area. The Target Location does not include the residential apartments that are believed to be located within the structure located at 41 Norfolk Street.

7.     I also submit this affidavit in support of an affidavit to search the person of Rodolfo PERALTA Salcedo, (DOB xx/xx/1984), who is depicted in Attachment A-2.

8.     As detailed herein, based on the investigation to date, there is probable cause to believe that FNU LNU, a/k/a "Luis" ("LUIS"), Rodolfo PERALTA Salcedo ("PERALTA"), and

3

others known and unknown (hereinafter, the "Target Subjects") are engaged in the distribution of controlled substances, in violation of 21 U.S.C. §841(a)(1) and conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846 (distribution and possession with intent to distribute controlled substances) (hereinafter, the "Target Offenses"). Based upon the information set forth herein, I believe that there is probable cause that the Target Location and the person of PERALTA contain evidence of the Target Offenses. I request authorization to search the Target Location and PERALTA as described in Attachments A-1 and A-2, respectively, for items described in Attachment B.

9.      The facts in this affidavit come from my personal observations and information obtained from other agents, investigators, and witnesses. My interpretations of conversations, conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. This affidavit is intended to show that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter. All times herein are approximate.

## **Procedural History**

10.      On March 10, 2022, the Honorable Marianne B. Bowler, United States Magistrate Judge, District of Massachusetts, issued a warrant authorizing the government to obtain precise location information data for cellular phone (929) 426-3553 (hereinafter, the "3553 Phone") used by LUIS [Dkt. No. 22-MJ-2138-MBB]. The affidavit (hereinafter, the "March 10 Affidavit") I submitted in support of that warrant is incorporated herein by reference and attached hereto.

**Probable Cause**

*Summary of Investigation*

11.     In June 2021, a male resident of Massachusetts died of what was medically determined to be a fentanyl overdose. According to the deceased's family, the deceased had a history of drug abuse. At the time of death, the deceased was using phone number (813) 230-9219 (the "9219 Phone"). The deceased's parents found approximately five blue pills, each marked with an "M" on one side and "30" on the other, in the deceased's shaving kit, which was in the deceased's possession prior to his death. The pills were sent to the DEA laboratory for testing, the results of which are outstanding. I know that "M/30" is a marker for Percocet 30 mg pills, which are prescription opioid pills that contain oxycodone. Based on the appearance of the pills, I believe the pills in the deceased's possession were counterfeit oxycodone pills. I know from my training and experience that drug traffickers use fentanyl to manufacture counterfeit oxycodone pills, such as Percocet pills. I further believe that based on the cause of death (fentanyl overdose) that the pills likely contain fentanyl.

12.     On December 20, 2021, the mother of the deceased turned the 9219 Phone over to me and gave consent for investigators to search and use the phone in furtherance of this investigation. Investigators reviewed the contents of the 9219 Phone, including the contacts, and identified contacts stored under the names: "Jay Dominican Republic"; "LUIS Blues"; "LUIS Buddy," and "Luissss."

13.     On January 10, 2022, investigators interviewed the deceased's widow who resides in Massachusetts. The widow told investigators that the deceased had a history of drug addiction, had relapsed during the "covid outbreak," and was using both cocaine and fentanyl pills at the time he overdosed. The widow explained that she and the deceased had purchased drugs from LUIS

over the years, dating back to 2013. She knew LUIS sold pills and also cocaine. She described LUIS as being a large Hispanic male who spoke English. According to the widow, LUIS also sold drugs to other college students and to individuals she and the deceased knew. To order drugs, customers would contact LUIS by phone. After a drug order was placed, either LUIS or a courier would deliver the drugs. One of the couriers she knew as "Luis's buddy." The widow said that over the years, LUIS changed his phone at times, and when he did, he would send a text message to all of his customers identifying his new phone.

14.     On February 21, 2022, the 9219 Phone (the deceased's phone) received an incoming text message sent from LUIS's 3553 Phone, which read, "This is my new number (LUIS)." On February 25, 2022, the 9219 phone received an incoming text message from the 3553 Phone that read, "What up bro."

15.     On March 1, 2022, the 9219 Phone received two more text messages from the 3553 Phone, which read, "My time from now on and I've got some new stuff. 9am/11pm. It's Luis" and "All day every day." The second text was followed with a smiley face and thumbs up emojis. The deceased's widow received the same two messages on March 1 from the 3553 Phone.

16.     On March 4, 2022, an investigator acting in an undercover capacity ("UC") sent a text message to the 3553 Phone acknowledging receipt of the March 1 text messages. LUIS replied using the 3553 Phone and exchanged a series of text messages with the UC, whom he believed to be the deceased. During the exchange, LUIS asked if the deceased had other friends in Boston or New York who wanted to purchase drugs ("Let me know if you got a friend who's looking for and Boston or in Nyc.") and quoted a price of $50 for cocaine ("The white is $50") and $35 for counterfeit Percocet pills ("the blues is $35"). LUIS confirmed any new customers should contact

him directly on the 3553 Phone and offered to send Percocet pills to the deceased in Florida ("If you need me to send you some blues to Florida you let me know.").

March 15, 2022, undercover purchase of pills

17.     On March 15, 2022, a UC, posing as the deceased, sent a text message to LUIS's 3553 Phone asking if LUIS could supply a friend with drugs. LUIS directed the UC to have his friend text him. A UC then exchanged a series of text messages with LUIS asking to purchase five pills ("I have $175 for the blue"). LUIS agreed ("5 blue") and directed the UC to 51 Norfolk Street in Dorchester to pick up the pills from a person who worked for LUIS ("Can you go to him please?"). The UC gave LUIS a description of the UC vehicle. I know from my training and experience that drug dealers often give a location near their drug stash location but not the actual address to protect their drug stash from being robbed by other drug dealers and/or identified by law enforcement.

18.     Shortly after 2:00 p.m., the UC arrived in the area of 51 Norfolk Street, which is a block away from the Target Location. At 2:14 p.m., LUIS sent the UC a text message saying that his courier was waiting for the UC ("He's there he's outside waiting for you."), and the UC indicated where he was parked. A couple of minutes later, a male, later identified as PERALTA, approached the passenger side of the UC vehicle. PERALTA had a respirator mask around his neck. PERALTA handed the UC a piece of paper that contained five blue pills. In return, the UC gave PERALTA $175. At 2:18 p.m., PERALTA walked away from the UC vehicle toward the area of 41 Norfolk Street. A surveillance officer observed PERALTA enter the fenced in area of the Target Location. At 2:28 p.m., an investigator saw PERALTA on the phone outside of the front gate to the Target Location still with a respirator around his neck.  The blue pills PERALTA sold the UC had the "M/30" markings and appeared to be counterfeit oxycodone pills. Based on my

training and experience and knowledge of this investigation, I believe they likely contain fentanyl. A field test yielded an inconclusive result, and the pills were sent to the DEA laboratory for testing.

March 24, 2022 undercover purchase of 10 pills

19.      On March 24, 2022, an investigator saw PERALTA arrive at and enter the Target Location at approximately 9:48 a.m. At approximately 10:46 a.m., a UC sent LUIS a text message asking to purchase 10 pills ("Good morning can I see your friend today? Need 10."). At 11:30 a.m., LUIS directed the UC to go to "8 Hopestill St, Dorchester" to pick up the pills. At approximately 12:02 p.m., LUIS instructed the UC to move to "24 Whitfield Street," which is the location of a side entrance to the Target Location. A few minutes later, investigators saw PERALTA walk from the area of the Target Location towards the UC vehicle. PERALTA got into the UC vehicle and handed the UC 10 blue pills, each with the "M/30" markings in exchange for $350. PERALTA got out of the vehicle and walked back towards the area of the Target Location. After the purchase, the UC sent LUIS a text confirming the purchase ("All set thank you."). A field test yielded an inconclusive result, and the pills were sent to the DEA for testing.

April 1, 2022 undercover purchase of 10 pills

20.      On April 1, 2022, a UC sent a text message to LUIS asking to purchase 10 pills ("Is your guy around today? . . . need 10 again."). The UC told LUIS a friend of the UC's would be picking up the pills ("Was going to send my friend. He took some last time."). LUIS agreed and told the UC to have the friend text him ("Ok bro . . . Tell him to text me."). LUIS asked if the UC had friends in New York who wanted to purchase drugs ("Yo bro you got friends in NYC?"). The UC replied that he did but they were cocaine buyers ("I do they are probably more interested in the white. I will ask."), and LUIS replied that he also sold cocaine ("Yes I got That . . . Hook me

up."). The UC agreed and said his friend named "Sean" would be contacting LUIS to arrange for the purchase of the 10 pills.

21.     At 12:00 p.m., another UC pretending to be "Sean" exchanged a series of text messages with LUIS. The UC explained that he wanted to pick up the 10 pills around lunchtime ("Trying to pick up 10 blue . . . I can meet up during lunch. Where should I go?"). LUIS directed the UC to "51 Norfolk Street Dorchester." The UC again texted LUIS when he arrived at 1:00 p.m. and gave a description of his vehicle. At the same time, an investigator saw PERALTA standing in front of the Target Location using a cellular phone.

22.     At 1:04 p.m., PERALTA walked towards the UC vehicle from the area of the Target Location and got into the UC vehicle. PERALTA gave the UC a crumpled piece of paper that contained 10 blue pills with the "M/30" markings, and the UC gave PERALTA $350. PERALTA asked the UC to drive up the street, and after approximately 100 yards, PERALTA asked the UC to stop. At 1:05 p.m., PERALTA got out of the UC vehicle, walked into a convenience store where he stayed briefly, and then walked towards and entered the Target Location at 1:07 p.m. The pills were sent to the DEA laboratory for testing.

23.     At 1:20 p.m., LUIS sent the UC a message saying the UC could call anytime to purchase more drugs ("Yo bro you can call me anytime you want bro"), and the UC affirmed ("TY. I will.").

   May 2022 attempted purchase of 100 pills

24.     On May 9, 2022, the UC who made the April 1 purchase from PERALTA ("Sean") sent LUIS a text asking if he could purchase a larger quantity of pills ("Can I get more then usual? Got some friends up in NH where im from.") and LUIS agreed ("Ok yes."). The UC asked if LUIS would lower the price per pill ("Number is just to high for more. Can we work something out?").

LUIS asked, "How many you need?" and the UC replied "100." LUIS told the UC he would sell the pills for no lower than $28 apiece. The UC said he would pick up the pills in a couple of days. The following day (May 10, 2022), the UC sent LUIS a text message confirming the purchase ("Whats up? Tomorrow still good?"), LUIS affirmed ("Yes"), and they agreed to do the deal around lunchtime.

25.     On May 11, 2022, the UC sent LUIS a text saying he would let LUIS know when he was close by. LUIS sent the UC an address ("8 Hopestill St Dorchester"), which was an address that LUIS had initially provided to the UC on March 24, 2022, and is a couple blocks away from the Target Location. The UC texted LUIS to confirm he had arrived at the location and gave a description of his vehicle. The UC continued texting LUIS for an update, but LUIS stopped returning the UC's texts. While the UC was still parked at 8 Hopestill Street, investigators saw PERALTA enter a vehicle and depart the area of the Target Location. Based on my training and experience, I believe LUIS did not deliver the drugs to the UC because either he or someone who worked for him believed the UC was working with law enforcement. I further believe PERALTA left the Target Location because whoever alerted LUIS also alerted PERALTA about the presence of law enforcement.

26.     On June 30, 2022, investigators spoke with a confidential source of information ("SOI").[1] The SOI was identified by investigators through a toll analysis of LUIS's 3553 Phone, which showed significant contacts with the SOI's phone. The SOI admitted that he/she had a history of opioid abuse, that he/she had relapsed, and that over the course of the last six months,

---

[1] I know the identity of the SOI but am omitting it from this affidavit to protect his/her identity and safety. Information provided by the SOI has been corroborated to the extent possible, and I believe information provided by the SOI is reliable.

he/she had purchased "fentanyl pills" several times per week from the area of the Target Location. Investigators reviewed SOI's phone and noted numerous text communications with LUIS's phone that were indicative of placing orders for pills. The SOI stated that he/she ordered the pills from LUIS and then picked them up from a male in the area of the Target Location. The SOI was shown a photograph of PERALTA, and he/she confirmed that the person depicted in the photograph was the person who had sold the SOI fentanyl pills on all but two occasions (LUIS sold the pills to the SOI on two occasions).

27.     According to the SOI, he/she had been purchasing fentanyl pills from LUIS for years before becoming sober. SOI relapsed about six months ago after he/she had received repeated texts from LUIS offering to sell him/her pills. According to SOI, several times a week over the last six months he/she would drive to the area of the Target Location and place a pill order with LUIS when he/she arrived. LUIS would then provide SOI a physical address in the vicinity of the Target Location, and PERALTA would shortly thereafter arrive on foot to deliver the pills. SOI told investigators that he/she had purchased fentanyl pills from PERALTA earlier that same day and the previous day, both times in the vicinity of the Target Location.

June 2022, controlled purchase of pills.

28.     On June 30, 2022, at approximately 4:05 p.m., investigators conducting surveillance in the area of the Target Location saw PERALTA working on a vehicle parked on the street near the Target Location. An investigator saw PERALTA going in and out of the fenced-in yard adjacent to the Target Location and the vehicle on the street. At approximately 5:50 p.m. that same day, the SOI, at the direction of investigators, sent LUIS a text message asking to purchase additional pills. LUIS agreed and directed the SOI to go to the area of the Target Location.

29.     The SOI texted LUIS when he arrived in the area at approximately 6:24 p.m. Shortly thereafter, investigators saw PERALTA walk from the area of the Target Location and towards the SOI's vehicle. Investigators had searched the SOI and SOI's vehicle for drugs and/or contraband prior to the SOI driving to the Target Location with negative results and equipped the SOI with a monitoring device that allowed investigators to listen to the conversations inside SOI's vehicle. Investigators observed PERALTA walking towards the SOI's vehicle and could hear PERALTA talking to SOI inside the vehicle. PERALTA gave the SOI a bag containing blue pills, each marked with "M/30," and the SOI gave PERALTA money that had been provided by investigators. The SOI was followed to a location where he gave the pills to investigators.  The pills were sent to the DEA laboratory for testing. Based on my training and experience and the investigation to date, I believe the pills are counterfeit oxycodone pills that likely contain fentanyl.

30.     After PERALTA left the SOI's vehicle, he walked toward Norfolk Street, stopped briefly (less than 10 seconds) in a barber shop, and then walked to and entered the gates to the left side garage of the Target Location. PERALTA then began to close the gates for the Target Location, apparently securing it for the night.

## **Target Location**

### ***Description of and Criminal Activity at Target Location***

31.     The Target Location is Ally's Inner City Auto Body & Sales, which is an autobody garage located at 41 Norfolk Street in Dorchester, Massachusetts. Based on surveillance observations, I believe that PERALTA works at the Target Location. The fact that all of the above detailed drug buys happened in the vicinity of the Target Location and that PERALTA either left from or returned to the Target Location after each of the drug buys, I believe PERALTA stores drugs and/or drug proceeds at the Target Location.

12

32.     Investigators have seen PERALTA either at or in the vicinity of the Target Location on numerous occasions in the last three months. Most recently, on June 30, 2022, investigators observed PERALTA entering the gates of the Target Location and securing the gates for the night after he sold pills to the SOI.

33.     I further believe that the Target Subjects store drugs at the Target Location because each time a drug order has been placed during the course of this investigation, whether it was a last minute order or an advance order, LUIS has directed the buyer to the vicinity of the Target Location and PERALTA has either come on foot from the area of the Target Location or directly from the Target Location to deliver the drugs. As detailed above, the SOI told investigators that over the course of the last six months, he has purchased fentanyl pills from PERALTA several times a week in the vicinity of the Target Location.

34.     Moreover, the registered owner of the Target Location is Jacqueline Serret. Serret has a criminal history that dates back to the 1990s and includes drug convictions for possession with intent to distribute controlled substances (2000) and manufacturing a Class A controlled substance and possession with intent to distribute Class B controlled substances (1997). Investigators saw PERALTA with Serret at the Target Location on June 30, 2022 prior to PERALTA delivering the pills to the SOI. Toll records for PERALTA's phone show that the number he calls most frequently is Serret's phone. Moreover, toll records show that a second phone believed to be used by LUIS has had contacts with both PERALTA's phone and the phone number for the Target Location.

35.     On July 6, 2022, an investigator conducting surveillance in the vicinity of PERALTA's residence observed a vehicle that LUIS has used to deliver counterfeit pills to a UC

in New York, most recently as June 29, 2022, parked in the rear of PERALTA's residence. PERALTA left the residence and went to the Target Location.

36.     Based on the investigation to date, LUIS's and PERALTA's long-term involvement in drug trafficking, the fact that investigators observed PERALTA leave from and/or return to the Target Location after conducting drug transactions, there is probable cause to believe that evidence of the Target Subjects' ongoing drug trafficking activities, including drugs, drug ledgers and records, phones used to conduct drug business, and drug proceeds, as set forth in Attachment B, will be found at the Target Location. A photograph and description of the Target Location are attached to and detailed in Attachment A-1, which is attached hereto and incorporated herein. A photograph and description of PERALTA is attached to and detailed in Attachment A-2, which is attached hereto and incorporated herein.

<u>Drug Trafficker's Use of Stash Locations and Cellular Telephones</u>

37.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

38.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

39.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their stash locations either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering are often kept in secure locations.

Moreover, the cash proceeds of drug trafficking and money laundering often contain traces of the narcotics sold or bought by the drug dealers.

40.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking, and many of these cellular telephones. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

41.     Finally, as noted above, evidence of drug trafficking and money laundering crimes can be found in the cell phones, smart phones, and computers referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones and computers.

42.     With the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular

telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

43.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

44.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is

unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

45.     The Target Location to be searched may contain computer equipment whose use in the Target Offenses or storage of the things described in this affidavit is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

46.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) one of the Target Subjects. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular

18

device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

47.     If the search team determines that there is no reason to seize certain computer equipment during the execution of this warrant, the team will create an onsite electronic "image" of those parts that are likely to store data specified in the warrant, if imaging is practical. Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files. Imaging permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer equipment. However, imaging at the premises can often be impractical because imaging is resource-intensive:  it can take hours or days, thus requiring law enforcement agents to remain at the premises for much longer than they would remain if they seized the items, and it can require personnel with specialized experience and specialized equipment, both of which might be unavailable. If law enforcement personnel do create an image at the premises, they will then search for the records and data specified in the warrant from the image copy at a later date off site.

48.     This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

<u>Unlocking a Device Using Biometric Features</u>

49.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

50.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

51.     The passcodes that would unlock the Subject Device/Apple device(s) found during the search of the Target Location or on the person of PERALTA is not currently known to law enforcement. Thus, it may be useful to press the finger(s) of the user(s) of the Subject Device/Apple device(s) found during the search of the Target Location and of PERALTA to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government

may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

52.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Location to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

53.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Target Subjects or co-conspirators identified in this affidavit to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

54.     I have participated in the execution of numerous search warrants at the residences and drug stash locations of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related and/or money laundering evidence typically have been recovered in both conventional and electronic formats:

      a.   controlled substances;

b. paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c. books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d. personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e. cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f. documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane

tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g. cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h. firearms and other dangerous weapons; and

i. identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

55.    Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking. I believe that evidence of their drug trafficking offenses will be found inside the Target Location, on PERALTA, and on certain cellular telephones, computers, or electronic equipment seized therefrom.

## CONCLUSION

Based on the information set forth above, probable cause exists to believe that the Target Subjects have engaged in the Target Offenses and that evidence of their criminal offenses, as set forth herein and in Attachment B will be found inside the Target Location and on PERALTA.

I, Brian W. Simpkins, hereby state under penalty of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

Brian W. Simpkins, Task Force Officer
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this 6th day of July 2022.

Honorable Marianne B. Bowler
United States Magistrate Judge
District of Massachusetts

24

## ATTACHMENT A-1

41 Norfolk Street, Dorchester, Massachusetts is a two story mixed use (commercial/residential) building located at the corner of Norfolk Street and Whitfield Street. The building is tan in color with white shutters. There is a fenced in grass area on the front side with steps leading up to the main door facing the street. The main door is brown with a window. Two mailboxes are affixed to the siding to the left of the door with the number "41" just above the mailbox. To the left side of the main residential structure is a fenced in driveway leading to an attached garage. This garage has a roof top deck with a door leading form the main residential structure. To the right side of the main residential structure is an attached one story commercial structure, which is tan in color. On top of the commercial structure is a black sign with white lettering that reads "Ally's Inner City Auto Body & Sales." The commercial structure has a garage door facing Whitfield Street. There is a large fenced in parking lot attached to the commercial structure filled with densely parked vehicles. The Target Location to be searched is the commercial office space for Ally's Inner City Auto Body & Sales, the garages that are attached to the commercial space, the adjacent fenced-in lot associated with the commercial space, and the vehicles that are parked inside of the fenced-in area. The Target Location does not include the residential apartments that are believed to be located within the structure located at 41 Norfolk Street. Below are photographs of the Target Location.







## ATTACHMENT A-2

### Photograph of Rodolfo PERALTA Salcedo

Rodolfo PERALTA Salcedo, (DOB xx/xx/1984) is a Hispanic male of Dominican descent. He has short brown hair and is depicted in the below photographs.





ATTACHMENT B
ITEMS TO BE SEIZED

I.      All records between January 1, 2021 and July 2022, whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841 and 846, including:

1.      Controlled substances.

2.      Firearms and ammunition.

3.      Materials, equipment and paraphernalia associated with the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, drug pressing machines, storage bins, containers, cutting agents, and scales.

4.      Documents containing data reflecting or memorializing the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records of purchases, log books, drug ledgers, wire transfer documents, personal telephone/address books containing the names of purchasers and suppliers of controlled substances used to manufacture controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

5.      Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, recordings, telephones, vehicle records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, and personal identification documents.

6.      Photographs and video and audio recordings which document an association with other coconspirators and/or which display controlled substances, firearms, or chemicals/materials used in the manufacturing of controlled substances.

7.      Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items.

8.      All documents and other materials evidencing the shipping or receipt of packages to or from the Target Subjects, including but not limited to invoices, waybills, packaging materials, postage meters, FedEx boxes, UPS boxes, USPS boxes, and account statements for accounts held at FedEx, UPS, the USPS, DHL, or other shipping companies.

9.      All documents evidencing or relating to foreign or domestic travel of the Target Subjects or their co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms.

10.     Cell Phones and Computers identified as used by or belonging to any of the Target Subjects: All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing narcotics trafficking or money laundering and/or referencing individuals engaged in narcotics trafficking or money laundering, located in the memory of any mobile telephone or computer belonging to or identified as being used by one of the Target Subjects.

        a.      For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

        1.      evidence of who used, owned, or controlled the computer equipment;

        2.      evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

        3.      evidence of the attachment of other computer hardware or storage media;

        4.      evidence of counter-forensic programs and associated data that are designed to eliminate data;

        5.      evidence of when the computer equipment was used;

        6.      passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7.      records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage.

II.      All computer hardware, computer software, and storage media. Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III.     During the execution of the search of the Target Location and Target Subject PERALTA described in the corresponding Attachments A-1 and A-2, law enforcement personnel are authorized to press the fingers (including thumbs) of PERALTA and the Target Subjects located within the Target Location to the sensor of the subject device and/or to hold the device in front of their faces in order to unlock or otherwise gain access to the subject device.

## DEFINITIONS

For the purpose of this warrant:

A.      "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.      "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.      "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an

encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.  "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.  "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.  "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes