## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A COMPLAINT AND SEARCH WARRANT

I, Brian W. Simpkins, being sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Massachusetts State Police Trooper since 2006, and am assigned to the Division of Homeland Security, Narcotics Unit. As a Massachusetts State Trooper, I was initially assigned to patrol out of the Framingham, Sturbridge, and Boston Barracks, and then to the Community Action Team in the city of Boston working in a high crime area focusing on gang and drug activity.

2.     Since July 2016, I have been assigned as a Task Force Officer to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.

3.     I am a graduate of the Municipal Police Training Committee ("MPTC") Police Academy (9th Municipal Police Officers Class, Weymouth), and the Massachusetts State Police Academy (79th Recruit Training Troop, New Braintree). Prior to becoming a trooper, I was a Canton Police Officer in a full and part-time capacity from 2001 to 2006. I have a Bachelor of Science degree in Criminal Justice from the Northeastern University. I have attended numerous

narcotics investigation courses, including a two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

4.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

5.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which drug traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of telephone calls to avoid speaking over the telephone.

**Purpose of the Affidavit**

6.      I submit this affidavit in support of a criminal complaint against Rodolfo PERALTA Salcedo ("PERALTA"), charging that beginning at least in or about March 2022 and continuing until the present, the defendant did knowingly and intentionally conspire to possess with intent to distribute and distribute fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §846.

7.      I also submit this affidavit in support of an application for a search warrant for the following target location, which is described as follows and in Attachment A:  122 Howard Avenue, second floor apartment, Dorchester, Massachusetts (hereinafter, "Target Location" or "PERALTA's Residence").

8.      As detailed herein, based on the investigation to date, there is probable cause to believe that FNU LNU, a/k/a "Luis" ("LUIS"), Carlos CORDERO, Rodolfo PERALTA Salcedo ("PERALTA"), and others known and unknown (hereinafter, the "Target Subjects") are engaged in the distribution of controlled substances, in violation of 21 U.S.C. §841(a)(1) and conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846 (distribution and possession with intent to distribute controlled substances) (hereinafter, the "Target Offenses").  Based upon the information set forth herein, I believe that there is probable cause that the Target Location contains evidence of the Target Offenses. I request authorization to search the Target Location for items described in Attachment B.

9.      This affidavit does not set forth all the facts developed during the course of this investigation.  Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the PERALTA has committed the above-described controlled substance offense and that evidence, fruits, and instrumentalities of these offenses will be found

3

in the Target Location. The facts in this affidavit come from my personal observations and information obtained from other agents, investigators, and witnesses. My interpretations of conversations, conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. All times herein are approximate.

**Procedural History**

10.     On March 10, 2022, the Honorable Marianne B. Bowler, United States Magistrate Judge, District of Massachusetts, issued a warrant authorizing the government to obtain precise location information data for cellular phone (929) 426-3553 (hereinafter, the "3553 Phone") used by LUIS [Dkt. No. 22-MJ-2138-MBB]. The affidavit (hereinafter, the "March 10 Affidavit") I submitted in support of that warrant is incorporated herein by reference.

11.     On July 7, 2022, Judge Bowler issued a warrant authorizing the government to search Ally's Inner City Auto Body & Sales, located at 41 Norfolk Street, Dorchester, Massachusetts [Dkt. No. 22-2320-MBB]. The affidavit (hereinafter, the "July 7 Affidavit") I submitted in support of that warrant is incorporated herein by reference and attached hereto. Investigators have not yet executed this search warrant for operational reasons, as described below.

**Probable Cause**

*Summary of Investigation*

12.     The background of this investigation is detailed in my July 7 Affidavit, which is attached, and is not repeated in full herein.

13.     Since March 2022, undercover investigators ("UCs") in both Massachusetts and New York have made controlled purchases of counterfeit oxycodone pills believed to contain fentanyl from the Target Subjects, including CORDERO (in New York) and PERALTA (in

Massachusetts). Each buy began with a UC contacting the 3553 Phone used by LUIS and placing an order for pills.[1] During one exchange between a UC and LUIS in March 2022, LUIS asked if the UC had other friends in Boston or New York who wanted to purchase drugs ("Let me know if you got a friend who's looking for and Boston or in Nyc.") and quoted a price of $50 for cocaine ("The white is $50") and $35 for counterfeit Percocet pills ("the blues is $35"). LUIS confirmed any new customers should contact him directly on the 3553 Phone. At the time, the location data for LUIS's phone indicated it was in New York.

14.     Investigators in Massachusetts passed the number for LUIS's 3553 Phone to DEA investigators in New York. Undercover officers in New York began ordering fentanyl pills by contacting the 3553 Phone. On March 24, May 25, June 29, and July 12, 2022, New York UCs purchased a total of approximately 109 counterfeit oxycodone pills by contacting the 3553 Phone. The pills field tested positive for fentanyl and were sent to the DEA laboratory for testing. On each occasion except July 12, CORDERO delivered the pills to the UC and arrived at the buy driving a Dodge Durango, bearing Pennsylvania license plate LWB0027 (the "Dodge Durango").

15.     During that same time frame, UCs in Massachusetts were also contacting LUIS's 3553 Phone and ordering pills. On three occasions (March 15, March 24, and April 1), PERALTA delivered the counterfeit oxycodone pills that the UCs ordered from LUIS. All of the purchases occurred in the vicinity of Ally's Inner City Auto Body & Sales, located at 41 Norfolk Street in Dorchester ("41 Norfolk Street"), which is where PERALTA works.

---

[1] All of the pills purchased during this investigation were marked with an "M" on one side and "30" on the other, which are the markings for Percocet oxycodone prescription pills.

16.     On June 30, 2022, investigators spoke with a confidential source of information ("SOI").[2] The SOI admitted that he/she had a history of opioid abuse, that he/she had relapsed, and that over the course of the last six months, he/she had purchased "fentanyl pills" several times per week from the area of the autobody shop located at 41 Norfolk Street. Investigators reviewed SOI's phone and noted numerous text communications with LUIS's phone that were indicative of placing orders for pills. The SOI stated that he/she ordered the pills from LUIS and then picked them up from a male in the area of 41 Norfolk Street. The SOI was shown a photograph of PERALTA, and he/she confirmed that the person depicted in the photograph was the person who had sold the SOI fentanyl pills on all but two occasions (LUIS sold the pills to the SOI on two occasions). SOI told investigators that on two occasions, SOI was directed to 11 Beaufort Lane in Dorchester to pick up the pills. On both occasions, PERALTA walked up to the SOI's vehicle and provided him fentanyl pills. 11 Beaufort Lane is approximately 225 feet from the Target Location.

17.     On June 30, 2022, at the direction of investigators, the SOI made a controlled buy of suspected fentanyl pills by contacting LUIS's 3553 Phone. PERALTA delivered the pills to the SOI.

18.     On July 6, 2022, an investigator conducting surveillance in the vicinity of the Target Location observed the Dodge Durango that CORDERO used to deliver fentanyl pills to the New York UCs parked in the rear of 120/122 Howard Avenue. The investigator saw CORDERO being dropped off at 122 Howard Avenue. CORDERO walked to the rear of the building, got into the Dodge Durango, and drove away. Later that day, CORDERO was seen at 41 Norfolk Street.

---

[2] I know the identity of the SOI but am omitting it from this affidavit to protect his/her identity and safety. Information provided by the SOI has been corroborated to the extent possible, and I believe information provided by the SOI is reliable.

CORDERO's vehicle remained at 120/122 Howard Avenue until July 12, 2022, when it returned to New York.  Based on physical surveillance observations and my knowledge of the investigation, I believe CORDERO was staying with PERALTA at the Target Location between July 6 and 12, 2022. On July 12, 2022, while CORDERO was still in Massachusetts, a New York UC contacted LUIS's 3553 Phone and placed an order for additional fentanyl pills. LUIS directed the UC to a location in New York to purchase the pills. The UC went to the location, and a male delivered 36 pills believed to contain fentanyl to the UC in exchange for $1,000.

19.     While CORDERO was in Massachusetts between July 6 and 12, toll records for the 3553 Phone showed a significant uptick in contacts with phones bearing Massachusetts-based area codes. Investigators believe CORDERO may be the holder of the 3553 Phone who uses the alias LUIS.

20.     Investigators plan to execute the search warrant for 41 Norfolk Street on July 18, 2022. If authorized, investigators plan to execute the warrant for the Target Location at the same time. That same day, investigators in New York plan to execute a search warrant at a location in New York where CORDERO is residing.

**Target Location**

***Description of and Criminal Activity at Target Location***

21.     The Target Location is 122 Howard Avenue, second floor apartment, Dorchester, Massachusetts. The Target Location is within a three-story, multi-residential dwelling bearing the address 120/122 Howard Avenue, Dorchester. The building is tan in color with green trim and a stone foundation. There is a fenced in grass area on the right side of the structure and a gravel driveway on the left side of the structure. There are steps leading from the sidewalk and under a covering to the main entrance of the structure. The steps are offset to the right side of the structure.

There are two doors at the top of the steps.  The door on the left side of the landing is labeled with the number "120" affixed to the door. The exterior entry door for the Target Location is on the right side of the landing and is labeled with the number "122" affixed to the door. There are three mailboxes affixed to the left side wall adjacent the door labeled "120."  There are no names on the boxes.  There is a doorbell affixed to the right side wall to the right of the door labeled "122."

22.     For the following reasons, I believe that PERALTA resides at the Target Location, specifically, the second floor apartment. Investigators have seen PERALTA exiting the door to 122 Howard Avenue, most recently as July 13, 2022. Utility records show that 120 Howard Avenue is the first floor apartment and the billing name on the account is Ulises Serret, who is the owner of the building located at 120/122 Howard Avenue. Utility records show that there is a second and third floor apartment at 122 Howard Avenue; the second and third floor apartments are listed as vacant, but utility records indicate usage in both. On July 13, 2022, two UCs posing as construction workers made contact with the resident of 120 Howard Avenue, who confirmed he resided in the first floor apartment, which is accessed through the outside door marked "120." The resident confirmed there were other tenants in the floors above his residence. That same day, the UCs observed PERALTA exit the right outside door marked "122" and walk down the steps of the residence.  At that time, the Spanish speaking UC approached and spoke with PERALTA. The UCs told PERALTA that access to the driveway of the building may be interrupted due to construction. When asked, PERALTA stated that he lived on the second floor. The UCs asked if anyone lived on the third floor, and PERALTA affirmed, but stated the person was currently at work.

23.     As detailed above, the SOI told investigators that over the course of the last six months, he has purchased fentanyl pills twice from PERALTA at a location that was approximately

225 feet away from the Target Location. Between July 6 and 12, 2022, CORDERO and his Dodge Durango were seen outside of 120/122 Howard Avenue and at 41 Norfolk Street. CORDERO's vehicle remained at 120/122 Howard Avenue until July 12, 2022, when it returned to New York. Based on physical surveillance observations and my knowledge of the investigation, I believe CORDERO was staying with PERALTA at the Target Location between July 6 and 12, 2022.

24.     Based on the investigation to date, LUIS's, CORDERO's and PERALTA's on-going and long-term involvement in drug trafficking, there is probable cause to believe that evidence of the Target Subjects' drug trafficking activities, including drugs, drug ledgers and records, phones used to conduct drug business, and drug proceeds, as set forth in Attachment B, will be found at the Target Location. A photograph and description of the Target Location are attached to and detailed in Attachment A, which is attached hereto and incorporated herein.

<u>Drug Trafficker's Use of Residences and Cellular Telephones</u>

25.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

26.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

27.     Likewise, money launderers keep detailed records of their financial transactions to evidence them. Because money launderers provide repeated services to some DTOs, it is necessary for them to maintain these records for extended periods to avoid unnecessary and duplicative exchanges of banking account information. This information is normally stored in the electronic devices that money launderers use to conduct financial transactions, such as cell phones and computers.

28.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

29.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering are often kept in their residences. Moreover, the cash proceeds of drug trafficking and money laundering often contain traces of the narcotics sold or bought by the drug dealers.

30.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

31.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which

they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

32.     Finally, as noted above, evidence of drug trafficking and money laundering crimes can be found in the cell phones, smart phones, and computers referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones and computers.

33.     With the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

34.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet

search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

35.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

36.     The Target Location to be searched may contain computer equipment whose use in the Target Offenses or storage of the things described in this warrant is impractical to determine

at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

37.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) one of the Target Subjects. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

38.     If the search team determines that there is no reason to seize certain computer equipment during the execution of this warrant, the team will create an onsite electronic "image" of those parts that are likely to store data specified in the warrant, if imaging is practical.  Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files. Imaging permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer equipment. However, imaging at the premises can often be impractical, because imaging is resource-intensive:  it can take hours or days, thus requiring law enforcement agents to remain at the premises for much longer than they would remain if they seized the items, and it can require personnel with specialized experience and

specialized equipment, both of which might be unavailable. If law enforcement personnel do create an image at the premises, they will then search for the records and data specified in the warrant from the image copy at a later date off site.

39.     This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

<u>Unlocking a Device Using Biometric Features</u>

40.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

41.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed

since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

42.     The passcodes that would unlock the Subject Device/Apple device(s) found during the search of the Target Locations is not currently known to law enforcement. Thus, it may be useful to press the finger(s) of the user(s) of the Subject Device/Apple device(s) found during the search of the Target Locations to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

43.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Location

to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

44.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Target Subjects or co-conspirators identified in this affidavit to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

45.     I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related and/or money laundering evidence typically have been recovered in both conventional and electronic formats:

   a.   controlled substances;

   b.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

   c.   books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

   d.   personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

   e.   cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable

items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f. documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g. cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h. firearms and other dangerous weapons; and

i. identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

46. Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking. I believe that evidence of their drug trafficking offenses will be found inside the Target Location and on certain cellular telephones, computers, or electronic equipment seized therefrom.

## CONCLUSION

Based on the information set forth above, probable cause exists to believe that the Target Subjects have engaged in the Target Offenses and that evidence of their criminal offenses, as set forth herein and in Attachment B will be found inside the Target Location. As set forth herein, probable cause exists to believe that PERALTA beginning at least in or about March 2022 and

continuing until the present, PERALTA did knowingly and intentionally conspire to possess with

intent to distribute and distribute fentanyl, a Schedule II controlled substance, in violation of 21

U.S.C. §846.


    I, Brian W. Simpkins, hereby state under penalty of perjury that the contents of this

affidavit are true and correct to the best of my knowledge, information, and belief.


                         Respectfully submitted,

                         Brian W. Simpkins, Task Force Officer
                         Drug Enforcement Administration


Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal
Procedure 4.1 this 14th day of July 2022.


Honorable Marianne B. Bowler
United States Magistrate Judge
District of Massachusetts

## ATTACHMENT A

The Target Location is 122 Howard Avenue, second floor apartment, Dorchester, Massachusetts. The Target Location is within a three-story, multi-residential dwelling bearing the address 120/122 Howard Avenue, Dorchester. The building is tan in color with green trim and a stone foundation. There is a fenced in grass area on the right side of the structure and a gravel driveway on the left side of the structure. There are steps leading from the sidewalk and under a covering to the main entrance of the structure. The steps are offset to the right side of the structure. There are two doors at the top of the steps.  The door on the left side of the landing is labeled with the number "120" affixed to the door. The exterior entry door for the Target Location is on the right side of the landing and is labeled with the number "122" affixed to the door. There are three mailboxes affixed to the left side wall adjacent the door labeled "120."  There are no names on the boxes.  There is a doorbell affixed to the right side wall to the right of the door labeled "122."



ATTACHMENT B
ITEMS TO BE SEIZED

I.      All records between January 1, 2021 and July 2022, whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841 and 846, including:

1.      Controlled substances.

2.      Firearms and ammunition.

3.      Materials, equipment and paraphernalia associated with the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, drug pressing machines, storage bins, containers, cutting agents, and scales.

4.      Documents containing data reflecting or memorializing the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records of purchases, log books, drug ledgers, wire transfer documents, personal telephone/address books containing the names of purchasers and suppliers of controlled substances used to manufacture controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

5.      Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, recordings, telephones, vehicle records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, and personal identification documents.

6.      Photographs and video and audio recordings which document an association with other coconspirators and/or which display controlled substances, firearms, or chemicals/materials used in the manufacturing of controlled substances.

7.      Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items.

8.      All documents and other materials evidencing the shipping or receipt of packages to or from the Target Subjects, including but not limited to invoices, waybills, packaging materials, postage meters, FedEx boxes, UPS boxes, USPS boxes, and account statements for accounts held at FedEx, UPS, the USPS, DHL, or other shipping companies.

21

9.      All documents evidencing or relating to foreign or domestic travel of the Target Subjects or their co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms.

10.     <u>Cell Phones and Computers identified as used by or belonging to any of the Target Subjects:</u> All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing narcotics trafficking or money laundering and/or referencing individuals engaged in narcotics trafficking or money laundering, located in the memory of any mobile telephone or computer belonging to or identified as being used by one of the Target Subjects.

> a.      For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

> 1.    evidence of who used, owned, or controlled the computer equipment;
> 2.    evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;
> 3.    evidence of the attachment of other computer hardware or storage media;
> 4.    evidence of counter-forensic programs and associated data that are designed to eliminate data;
> 5.    evidence of when the computer equipment was used;
> 6.    passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;
> 7.    records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage.

II.     All computer hardware, computer software, and storage media. Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III.    During the execution of the search of the Target Location described in the Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of PERALTA

22

and the Target Subjects located within the Target Location to the sensor of the subject device and/or to hold the device in front of their faces in order to unlock or otherwise gain access to the subject device.

## DEFINITIONS

For the purpose of this warrant:

A.    "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.    "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a username; or a password), whether stored deliberately, inadvertently, or automatically.

D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.    "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or

instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.